IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

M.C.E., a minor, by her mother and          *
next friend T.Q.A.,
                                             *
              Plaintiffs,
                                             *
v.                                               Civil Action No.:   RDB-09-3365
                                             *
BOARD OF EDUCATION OF
FREDERICK COUNTY, *et al.*,                   *

              Defendants.                     *

*       *       *       *       *       *       *       *       *       *       *       *       *

## <u>MEMORANDUM OPINION</u>

Plaintiffs M.C.E., a minor student, and T.Q.A., her mother, bring this motion for summary judgment challenging the decision of Administrative Law Judge Judith Jacobson ("ALJ") of the Maryland State Office of Administrative Hearings dismissing Plaintiffs' Due Process Complaint and determining that M.C.E. was not denied a free appropriate public education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.  Defendants, collectively referred to as Frederick County Public Schools ("FCPS"), have filed a cross motion for summary judgment, submitting that judgment should be upheld in their favor.  This Court has reviewed the entire administrative record and has carefully examined the parties' submissions.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2010).  For the reasons that follow, Plaintiffs' Motion for Summary Judgment (ECF No. 23) is DENIED and Defendant's Cross Motion for Summary Judgment (ECF No. 27) is GRANTED, and this Court accordingly upholds the decision of the Administrative Law Judge.

## I. The Individuals with Disabilities Education Act

The IDEA requires all states that receive federal funds for education to provide each disabled child between the ages of three and twenty-one with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A). A FAPE must provide a disabled child with meaningful access to the educational process. *Bd of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982) ("[I]n seeking to provide . . . access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."). In other words, a FAPE must be reasonably calculated to confer some educational benefit on the disabled child. *Id.* at 207. Such benefit must be provided in the least restrictive appropriate environment, with the disabled child participating to the "maximum extent appropriate" in the same activities as his or her non-disabled peers. 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550 ("Each public agency shall ensure . . . (2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes cannot be achieved satisfactorily."); *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989) ("mainstreaming of handicapped children into regular school programs ... is not only a laudable goal but is also a requirement of the Act").

The IDEA does not, however, require a school district to provide a disabled child with the best possible education. *Rowley*, 458 U.S. at 192. Although a state must "provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child," the IDEA "does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Hartmann v. Loudoun Cnty Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (internal quotation marks and citations omitted). To assure the

delivery of a FAPE, the IDEA requires a school district to provide an appropriate Individualized Education Program ("IEP") for each child determined through evaluation to be learning disabled. 20 U.S.C. § 1414(d). Preparation of the IEP requires the collaboration of an IEP team consisting of the child's parents, one of the student's regular teachers, a special education teacher, a representative of the school board, an individual who can interpret evaluation results, and, where appropriate, the disabled child. *See* 20 U.S.C. § 1414(d)(1)(B). The United States Court of Appeals for the Fourth Circuit has noted that, "[a]n appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM ex rel DM v. Sch. Dist. of Greenville Co.*, 303 F.3d 523, 527 (4th Cir. 2002) (citing 20 U.S.C. § 1414(d)(1)(A)).

The IDEA also establishes procedural safeguards to "ensure that the parent or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to those decisions." *Id.* (internal quotation marks and citations omitted); *see also* 20 U.S.C. § 1415 (safeguards). If the parents are not satisfied with the IEP, they may "present complaints with respect to any matter related to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such a child," 20 U.S.C. § 1415(b)(6), and may thereafter request a due process hearing conducted by the state or local educational agency, *id.* § 1415(f). Under Maryland law, the Maryland Office of Administrative Hearings conducts the due process hearing. Md. Code Ann., Educ. § 8-413; Md. Regs. Code tit. 13A, § 05.01.15. An aggrieved party may then appeal the administrative ruling to federal or state court. Md. Code Ann., Educ. § 8-413(h).

When a FAPE is not provided to a disabled student, the student's parent may place the

child in a private school and then seek tuition reimbursement from the state.  *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985).  To establish entitlement to reimbursement for unilateral private placement, certain conditions must be met.  Title 20, § 1412(a)(1)(C)(ii), states:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

Reimbursement may be reduced or denied if:

> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

> Or,

> (III) upon a judicial finding of unreasonableness with respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii)(I), (III).  Finally, in order to receive reimbursement, the private education services obtained by the parents must be appropriate to meet the child's needs.  *Sch. Comm. of Burlington*, 471 U.S. at 370.

## II.     Background[1]

---

[1] The facts set forth in this section are derived from the administrative record of the due process hearing, including the hearing transcript and admitted exhibits.

In 2004, M.C.E. began attending prekindergarten at Monocacy Valley Public Charter School ("Monocacy Valley"), a public school in Frederick County, Maryland. By the fall of 2006, M.C.E. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and anxiety disorder. Based upon this diagnosis and its potential impact on M.C.E.'s education, FCPS found M.C.E. eligible for special education services during a series of Individualized Education Program team meetings. M.C.E. subsequently received part-time special education services for the remainder of her time at Monocacy Valley, which included 3.75 hours per week of specialized instruction during the 2006-07 school year, and 5.25 hours per week of specialized instruction during the 2007-08 school year. Nonetheless, M.C.E. did not progress in reading and math commensurate with her age and ability during that time.

In March 2008, M.C.E.'s assigned special education teacher, Melinda Patton ("Patton"), reported that M.C.E. was not making sufficient progress and was still reading at the pre-kindergarten level, though she was now in the second grade. Patton called T.Q.A., M.C.E.'s mother, and told her that until M.C.E. learned to read, "there was no point to doing anything else." After having M.C.E. go through an evaluation which ruled out that medical issues were causing her academic problems, T.Q.A. contacted FCPS representatives to learn whether there were any educational alternatives for M.C.E. that were superior to Monocacy Valley. Upon being told that Monocacy Valley was M.C.E.'s best public option, T.Q.A. researched what private schools were available to students with reading disabilities. T.Q.A. found The Friendship School ("Friendship"), a private school in Eldersburg, Maryland, which specializes in teaching students with language-based learning differences. T.Q.A. applied to this school on behalf of her daughter, but M.C.E. was not accepted at that time.

After an IEP team meeting on May 27, 2008, FCPS determined that a comprehensive reading program called "Horizons" might be helpful for M.C.E. during the coming year, when she would enter third grade. Since no one at Monocacy Valley was trained in Horizons, Patton was trained over the summer of 2008. On August 19, 2008—before M.C.E. began the Horizons program—T.Q.A. wrote to FCPS's Coordinator of Special Education for elementary schools, Elizabeth Rhodes ("Rhodes"), asking her to assist in obtaining a classroom aide for M.C.E. and whether it would be possible to place M.C.E. in a private special education school for students with dyslexia. In response, Rhodes arranged for T.Q.A. to visit M.C.E.'s neighborhood school, Lincoln Elementary, to determine whether that might be a better fit than Monocacy Valley. T.Q.A. concluded after visiting Lincoln that Monocacy Valley was better equipped to educate her daughter. In September 2008, M.C.E. continued onto third grade at Monocacy Valley, where she began working with Patton on the Horizons reading program.

Within a month after M.C.E. started third grade T.Q.A. wrote another letter to Rhodes as well as to Monocacy Valley's principal explaining her concerns that her daughter was not making sufficient progress, and that neither Monocacy Valley nor any other FCPS school could meet M.C.E.'s educational needs. T.Q.A. therefore requested for a second time that FCPS consider placing M.C.E. in a private school. Before Rhodes could arrange for an IEP team meeting to address this issue, though, M.C.E. was hospitalized at Johns Hopkins Hospital ("Johns Hopkins") for symptoms of mood disorder and anxiety. M.C.E. remained at Johns Hopkins for one week, from October 3, 2008 through October 10, 2008.

During the ten days between the date that M.C.E. was discharged from Johns Hopkins and her next scheduled IEP team meeting, FCPS assessed M.C.E.'s occupational therapy and assistive technology needs. The occupational therapist who conducted that assessment, Stephen

Buckley ("Buckley"), found M.C.E.'s attention and handwriting skills to be well below where they should have been for a student her age. At the following IEP team meeting, on October 20, 2008, M.C.E.'s IEP was revised to incorporate Buckley's recommendations for improving her skills in both areas. The team approved of providing M.C.E. with an instructional assistant to help her stay focused per T.Q.A.'s request.

At the meeting, M.C.E.'s IEP team discussed whether she should continue her studies at Monocacy Valley. M.C.E.'s psychologist, Dr. Cynthia Wilcox ("Dr. Wilcox") stated that Monocacy Valley was currently an appropriate school for M.C.E., especially with the increased instruction she would receive under the new IEP, but expressed concern about M.C.E. staying at Monocacy Valley the next year, when she would enter fourth grade. In response, Rhodes suggested that the Pyramid Program at Lewistown Elementary School ("Lewistown") would be the best fit for M.C.E.'s needs. Pyramid serves students with significant emotional and behavioral needs and requires intensive special education and therapeutic services in a small-group setting. During the 2008-09 school year, there were five students in each Pyramid classroom, with one special educational teacher and two assistants per classroom. Pyramid has three social workers on staff, an occupational therapist who comes on a weekly basis, and its own bus system with seven buses, each of which is staffed with a driver and an assistant who are trained to handle students with behavioral problems.

Rhodes suggested that T.Q.A. visit Lewistown to familiarize herself with the Pyramid Program. In November 2008, T.Q.A. visited Pyramid, spending almost two hours there. While at Pyramid, T.Q.A. observed that the program uses a locked seclusion room, which is used when a student acts in such a way as to potentially harm himself or other students. T.Q.A. became concerned about the possibility that her daughter would be educated alongside students with

behavioral problems. A social worker at Pyramid told T.Q.A. that all of the students at Pyramid were emotionally disturbed, and T.Q.A. witnessed a violent student outburst during her visit. T.Q.A. did not think M.C.E.'s misbehavior warranted such a severe setting, and doubted whether Pyramid could adequately address her daughter's learning disabilities. Based on this visit, T.Q.A. determined that Pyramid was not an appropriate school for her daughter.

After the October 20, 2008 IEP meeting, FCPS hired an instructional aide whose sole purpose was to keep M.C.E. on task. Though this aide had only a high school degree and no experience in education, she was able to keep M.C.E. on task at all times. The aide kept a log of M.C.E.'s behavior at Patton's request. The following month, doctors at Johns Hopkins performed psychological and auditory processing evaluations of M.C.E. These doctors concluded that M.C.E. had ADHD, learning disabilities and emotional problems. Specifically, the evaluation noted that though M.C.E. displayed an average to higher level of cognitive functioning, most of her basic academic skills were weak.

On February 23, 2009, FCPS held a County IEP meeting and invited FCPS staff who had worked with or assessed M.C.E., as well as representatives from Lincoln and the Pyramid Program. FCPS representatives reviewed M.C.E's new evaluations and school performance, noting that she had started the current school year happier than she had in previous years, and appeared more emotionally stable. At the same time, M.C.E.'s academic abilities remained significantly behind where they should have been for a third grader. The meeting ended early due to scheduling conflicts, but the parties agreed to meet again in a few months to finish M.C.E.'s IEP.

In the interim, Barbara Luborsky ("Luborsky"), an occupational therapist who had worked with M.C.E. from June 2007 to June 2008, reviewed the Johns Hopkins test results.

Luborksy found a number of areas of concern with regard to M.C.E.'s motor skills, which Luborsky believed were related to M.C.E.'s problems with attention and focus. Luborsky concluded that M.C.E. would be increasingly unable to meet the demands for written work when she entered fourth grade, and that occupational therapy should be included in her IEP.

On April 27, 2009, the County IEP team reconvened to discuss M.C.E.'s Individualized Education Program. At the meeting, FCPS staff reported that since the last meeting M.C.E. continued to display increased on-task behavior, which was likely due to the assistance of her individual instructional aide. Nonetheless, M.C.E. remained below grade level in language arts, math and written expression. FCPS staff also reported that M.C.E.'s inappropriate behaviors had increased since early February. Though no occupational therapist attended this meeting, Rhodes summarized Luborsky's written review of M.C.E.'s records. The IEP team ultimately recommended that M.C.E. receive extended school year services of two hours extra help in reading per week during July 2009. The IEP set goals for M.C.E. to progress to the academic level of a first grader by October 2009, the second month that she would be in fourth grade, and recommended M.C.E. receive 39 hours of instruction per week by a special education teacher, instructional assistant and social worker.

Under this new IEP, the amount of instruction M.C.E. needed exceeded the number of hours in any FCPS school week, which led the IEP team to discuss where she could receive such extensive services. The team determined that neither Monocacy Valley nor Lincoln, M.C.E.'s home school, could provide such services. Thus, the team concluded that the Pyramid Program was the next step. After T.Q.A. and M.C.E.'s stepfather, D.A., raised their concerns about Pyramid's appropriateness for their daughter, they were told that they could appeal the IEP team's decision if they disagreed with it, and that if Pyramid turned out to be the wrong school

for M.C.E., the IEP team would meet again. The IEP team also agreed that M.C.E. should have a chance to visit Pyramid before starting there, and therefore recommended that she enter the Program two weeks later, on May 11, 2009.

On May 8, 2009, T.Q.A. visited Pyramid for a second time, this time accompanied by M.C.E.'s stepfather and psychologist, Dr. Wilcox. This visit did not change T.Q.A.'s opinion that Pyramid was an inappropriate school for her daughter, an opinion with which her husband agreed. Dr. Wilcox also expressed concern that placing M.C.E. at Pyramid would cause her to become less emotionally stable. Given these concerns, T.Q.A. reapplied to Friendship on behalf of M.C.E., and this time her daughter was accepted for the 2009-10 school year. T.Q.A. felt that Friendship was a far better fit for M.C.E. and would supply her with the kind of specialized and individualized instruction no FCPS school could offer.

On May 12, 2009, T.Q.A. filed a due process request on behalf of her daughter challenging M.C.E.'s 2009 Individualized Education Plan, which served to keep M.C.E. at Monocacy Valley—rather than move to Pyramid—through the end of third grade. T.Q.A. also requested reimbursement for the tuition for Friendship. The administrative due process hearing took place over seven non-consecutive days in July 2009. The ALJ heard all the aforementioned evidence, as well as testimony about the educational program Pyramid would offer M.C.E. T.Q.A. called four expert witnesses to explain M.C.E.'s significant emotional and psychological problems, and FCPS called three witnesses who expressed their opinions that the IEP that FCPS had developed was sufficient to address T.Q.A.'s concerns and meet M.C.E.'s educational needs.

On August 19, 2009, the ALJ issued a 41-page decision finding that FCPS had not denied M.C.E. a free appropriate public education, that Defendant FCPS's proposal to place M.C.E. at Pyramid did not violate her rights to a FAPE, and denying T.Q.A.'s request for reimbursement

for Friendship's tuition. On December 17, 2009, M.C.E., by her mother T.Q.A., appealed the ALJ's findings to this Court, again seeking reimbursement for her placement of M.C.E. at Friendship. FCPS opposes Plaintiffs' motion, and has also filed a motion for summary judgment.

Because Judge Jacobson's factual findings were regularly made they must be viewed as *prima facie* correct. *MM*, 303 F.3d at 531. It remains, however, for this Court to reach its own *de novo* determination of the facts, giving "due weight" to Judge Jacobson's findings, and to explain any deviation from those findings. *Id.* at 530-31.

## III. Standard of Review

The Fourth Circuit has articulated the appropriate standard of review with respect to motions for summary judgment in an IDEA case:

> In a judicial proceeding under the IDEA, a reviewing court is obliged to conduct a modified de novo review, giving "due weight" to the underlying administrative proceedings. In such a situation, findings of fact made in administrative proceedings are considered to be *prima facie* correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute [its] own notions of sound educational policy for those of local school authorities . . . .

*MM*, 303 F.3d at 530-31. Specifically, this Court must follow the two-step inquiry articulated in *Rowley*. *See* 458 U.S. at 206. First, this Court must determine whether the state or local educational authority complied with the procedures set forth in the Act. *Id.* Second, this Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Id.* at 207. As the party challenging the administrative findings, Plaintiffs bear the burden of proof of establishing a violation of the IDEA. *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991); *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446, 457 (D. Md. 1999).

This Court's analysis necessarily involves a review of the administrative record. This Court must make a "bounded independent decision based on the preponderance of the evidence, giving 'due weight' to the state proceedings." *Cavanagh*, 75 F. Supp. 2d at 457 (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991)). "If the administrative findings were made in a regular manner and have evidentiary support, they are to be considered *prima facie* correct." *Id.* In addition, this Court's analysis is shaped by the mandate of Rule 56(c) of the Federal Rules of Civil Procedure that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

IV.    **Analysis**

Plaintiffs raise both procedural and substantive arguments on appeal.

A.    **Procedural Challenges**

Plaintiffs' procedural challenges are that FCPS (1) "predetermined" M.C.E.'s placement in the Pyramid Program before it developed her IEP, and (2) did not convene the legally required IEP team at the April 27, 2009 IEP team meeting.   Under the Individuals with Disabilities Education Act, a procedural violation is only actionable if it interferes with a provision of the student's free appropriate public education.   The United States Court of Appeals for the Fourth Circuit has made clear that, ordinarily, procedural violations of the IDEA are subject to a harmlessness analysis.   The Fourth Circuit has explained that:

> However, to the extent that the procedural violations did not actually interfere with the provision of a free appropriate public education, these violations are not sufficient to support a finding that an agency failed to provide a free appropriate public education.

*DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester County, Md.*, 309 F.3d 184, 190 (4th Cir.2002) (quoting *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir.1997)).   The Fourth Circuit reiterated that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or h[er] parents would be entitled to reimbursement relief," even when the procedural violation "interfere[s] with the parents' ability to participate in the development of their child's IEP." *DiBuo*, 309 F.3d at 190-91 (4th Cir.2002); *see also A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (noting that procedural violations are subject to "harmlessness" analysis, while substantive violations of the IDEA are not).

1.    **Alleged Predetermination of M.C.E.'s Placement**

Plaintiffs contend that FCPS violated the IDEA by "predetermining" that M.C.E. should be placed in the Pyramid Program at Lewistown Elementary. The ALJ concluded in her decision that FCPS did not predetermine her placement in advance of the complete development of the IEP. In making this decision, the ALJ found that there was no evidence of predetermination prior to the April 27, 2009 County IEP team meeting. Decision at 23-24. Specifically, the ALJ found that several placement options were discussed at the meeting, that there was extensive discussion about T.Q.A.'s concerns with the appropriateness of the Pyramid Program, and that the IEP team members took those concerns seriously. Decision at 25.

Plaintiffs contend that this case is analogous to *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 259 (4th Cir. 1988). In *Spielberg*, the United States Court of Appeals for the Fourth Circuit held that a school board may not predetermine what school a student may be placed in before creating the student's Individualized Education Plain and engaging in a discussion over what schools are suitable under the student's IEP. In *Spielberg*, the Fourth Circuit found that the school system's placement decision was unlawful under the precursor to the IDEA because the decision was made *before* developing the student's IEP. As in that case, Plaintiffs assert that this Court should find that FCPS committed a procedural violation by determining that M.C.E. should be placed in the Pyramid Program before finalizing her IEP and without sufficiently discussing other placement options.

In the years since *Spielberg*, this Court has more thoroughly explained the standards a school board must meet when making educational decisions for a disabled student. In *Hanson v. Smith*, 212 F. Supp. 2d 474, 485-86 (D. Md. 2002), for example, this Court stated that although a

school board must come to the IEP table with an open mind, it does not have to come with a blank mind:

> As explained in *Doyle v. Arlington County School Board*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992), if the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input. The Court in *Doyle* went on to state that the holding of *Spielberg* required the school board to come to the table with an "open mind," but did not require them to come to the IEP table with a "blank mind." *Id.* Thus, while a school system must not finalize its placement decision before an IEP meeting, it can and should have given some thought to that placement. *Id.*

Other circuits have similarly held that a school board may come to an IEP team meeting with some idea of what placement may be best for a student. As the United States Court of Appeals for the Sixth Circuit described in *Nack v. Orange City School District*, 454 F.3d 604 (6th Cir. 2006):

> [P]redetermination is not synonymous with preparation. Federal law prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.

*Id.* at 610 (internal quotation and citation omitted). *See also Ms. S., ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1132 (9th Cir. 2003) ("A school district violates IDEA if it independently develops an IEP, without meaningful participation, and then simply presents the IEP to the parent for ratification."); *N.L. v. Knox Cnty. Schs.*, 315 F.3d 688, 694 n. 3 (6th Cir. 2003) (holding that school officials are permitted to form opinions and compile reports prior to IEP meetings.)

After reviewing the evidence in this case and making an independent determination while giving due weight to the findings of the ALJ who heard testimony on the subject, this Court concludes that this case is not similar to *Spielberg*, as the decision to place M.C.E. at the

Pyramid Program was not predetermined in advance of the completion of the IEP. There was credible evidence before the ALJ that the school board came to the IEP meetings with an open mind, and that M.C.E.'s parents and representatives were given an opportunity to provide meaningful input as to her placement. Though the school board may have come to the meeting with the idea that the Pyramid Program was the best place for M.C.E., that is not a violation of IDEA. The transcript of the April 27, 2009 County IEP team meeting shows that the County IEP team developed the appropriate IEP for M.C.E. before discussing where to place her. The IEP team then began the conversation regarding the best school for M.C.E. by acknowledging that neither Monocacy Valley nor Lincoln was an appropriate placement for M.C.E. as they did not have the teachers and support staff she needed. In their Motion, Plaintiffs concede that there was no disagreement regarding the inadequacy of Monocacy Valley and Lincoln.

All of M.C.E.'s representatives took part in the discussion with respect to whether Pyramid was a suitable placement for her. The meeting transcripts show that M.C.E.'s psychologist, Dr. Wilcox, actively participated in the conversation, though she expressly refrained from commenting on whether the program was or was not appropriate for M.C.E. Additionally, M.C.E.'s mother and stepfather were given the opportunity to express their objections to Pyramid. Thus, after examining the exhibits and reviewing the transcripts, this Court finds that FCPS came prepared to recommend placing M.C.E. at the Pyramid Program, but had not predetermined where she would go. Instead, they addressed the various options, as well as the positives and negatives regarding the best available public option for M.C.E., Pyramid. Accordingly, no procedural violation occurred because of the timing of FCPS's placement decision.

**2.      Participation Requirements for the April 27, 2009 County IEP Meetings**

Plaintiffs assert that FCPS committed a procedural violation when it did not include an occupational therapist at the April 27, 2009 County IEP team meeting. The ALJ disagreed, holding that FCPS did not violate the IDEA because occupational therapy was not a significant issue at the meeting. Decision at 22. The regulation on IEP meeting attendance requirements, 34 C.F.R. § 300.321, does not expressly require service providers such as an occupational therapist to attend IEP team meetings. The regulation's comments, however, state that if a meeting "involves a modification to, or discussion of, the . . . related services" an occupational therapist or other related service provider is required to attend unless excused by the parent. 71 Fed. Reg. 46675 (2006).

After reviewing the record, this Court finds that the participation requirements for the April 27, 2009 County IEP team meeting were met. The County IEP team meeting began on February 23, 2009, and the County IEP chairperson announced at the start of the meeting that if they did not get through all the tasks at hand they would schedule another time to meet and continue the meeting. Notably, Stephen Buckley, an occupational therapist employed by FCPS, testified at this meeting regarding M.C.E.'s occupational therapy needs. As anticipated, the County IEP team did not get through all items of business that day, and therefore reconvened on April 27, 2009. Though no occupational therapist attended at the reconvened meeting, the County IEP team did not modify the part of the IEP that had been developed to address M.C.E.'s occupational therapy needs. Instead, Plaintiffs' attorney merely brought up that T.Q.A. had asked Barbara Luborsky, their own occupational therapist, to look over all of the previous occupational therapy reports for M.C.E.. Plaintiffs' attorney noted that: "I do not think [Luborsky's review] has any impact on any decisions that have already been made." Meeting Tr.

at 4. Accordingly, no procedural violation occurred because of the timing of the absence of an occupational therapist during the reconvened meeting held on April 27, 2009.

**B.      Substantive Challenges**

Plaintiffs' substantive challenges are that the IEP did not provide M.C.E. with adequate (1) specialized instruction, (2) occupational therapy services, (3) goals and objectives, and (4) Extended School Year services. The ALJ addressed each of Plaintiffs' concerns in her decision, finding that the IEP was reasonably calculated to provide educational benefits to M.C.E. with respect to each of these issues.

As described above, the Supreme Court has held that an IEP as proposed by a local education agency must be must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. As this Court further explained in *King v. Board of Education of Allegany County*, 999 F. Supp. 750, 766 (D. Md. 1998), "The lynchpin of the IDEA is its requirement that disabled children be provided with a free appropriate public education." (internal quotations omitted). Interpreting Fourth Circuit precedent, *King* held that "there is no requirement that the state provide the child with the best education—public or private—that money can buy, nor is the state required to maximize the potential of the student. All that is required is that the disabled child benefit educationally from the program." (internal citations omitted). In other words, the IDEA does not mandate that *every possible* special service be offered to a disabled student, nor that every special education service provider have the best possible training. *Hartmann v. Loudoun Cnty. Bd. of Ed.*, 118 F.3d 996 (4th Cir. 1997). Thus, "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second guess the judgment of education professionals." *A.B. v. Lawson*, 354

F.3d 315, 326 (4th Cir. 2004) (quoting *Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200 (4th Cir. 1990)).

### 1.    Specialized Instruction

T.Q.A. argues that M.C.E.'s IEP was "deficient" because it did not guarantee that her daughter would work with a reading specialist during the school year.  As a result, Plaintiffs contend that the IEP was not reasonably calculated to deliver educational benefits in reading.

Plaintiffs' claim amounts to an attempt to make the absence of a guarantee that M.C.E. would receive time with Pyramid's reading specialist into a violation of the IDEA.  It is not.  The comments to the IDEA regulations state that an IEP must include "information about the amount of services that will be provided to the child, so that the level of the agency's commitment of resources will be clear to parents and other IEP team members."  71 Fed. Reg. 46667 (Aug. 14, 2006).  The IEP describes in great detail the kind of special services M.C.E. would receive in the upcoming school year, including that she would receive instruction from special education teachers and access to a screen reader to assist her with decoding text.  The goals section of the IEP states that M.C.E. required assistance with her reading abilities, and specifies certain reading benchmarks towards which M.C.E. and her instructors would work.

It is worth noting that there is no obligation that a school board guarantee every type of specialized instruction that would be helpful to a student.  The standard is not that an IEP must be reasonably calculated to deliver educational benefits in all subject areas that a student needs improvement.  Holding a school board to such a high standard would contradict the Supreme Court's admonition that the IDEA does not require "the furnishing of every special service necessary to maximize each handicapped child's potential."  *Rowley*, 458 U.S. at 199.  *See also Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1004 (4th Cir. 1997) ("the

IDEA does not guarantee the ideal educational opportunity for every disabled child."). Thus, though the IEP does not guarantee M.C.E. access to a reading specialist, the IEP is reasonably calculated to enable M.C.E. to receive educational benefits with respect to reading. Accordingly, FCPS did not commit a substantive violation by failing to make reference to a specialized reading instructor in M.C.E.'s IEP.

### 2. Occupational Therapy Services

Plaintiffs assert that "the ALJ misapplied the law regarding expert credibility and misstated the record" when she accepted the opinion of Stephen Buckley, an occupational therapist for FCPS who assessed M.C.E.'s occupational therapy needs, over the opinion of Barbara Luborsky, who provided M.C.E. with weekly occupational therapy assistance from June 2007 to June 2008. Summ. J. Mem. at 39. The IEP provided that M.C.E. would receive consultative occupational therapy services, with the frequency of the services subject to her needs. IEP at 16. The areas of need listed in the IEP were M.C.E.'s ability to hold a writing tool, and the use of "fidget activities" to keep her on task. *Id*. Buckley concluded that these occupational therapy services were appropriate and met the M.C.E.'s needs. Luborsky found that the IEP was not specific enough about the kinds of occupational therapy services M.C.E. required.

Plaintiffs complain that the ALJ misstated the record in finding that Luborsky "had seen M.C.E. only once" and by characterizing this meeting as an "informal observation" in a "camp setting." Summ. J. Mem. at 43. In fact, it is Plaintiffs who mischaracterize the ALJ's determination. The ALJ did not find that Luborsky had seen M.C.E. "only once." Instead, she accurately noted that Luborsky provided M.C.E. with occupational services that had ended in June 2008, but that Luborsky's only contact with M.C.E. since then was her informal observation

of the student one week prior to the hearing at a program in which M.C.E. participated.  Though Plaintiffs take issue with the ALJ's description of M.C.E.'s program as a "camp setting," that characterization does not seem out of line with Luborsky's own description of the program as "just a little summer enrichment group," as well as her acknowledgment that nothing educational or academic occurred during at the program.  Tr. at 480-81.  Notably, Plaintiffs mislead this Court by stating that Luborsky spent one week with M.C.E. without noting that Luborsky was with M.C.E. for less than three hours each day during that week.  Tr. at 480.

Plaintiffs also take issue with the ALJ's criticism of Luborsky's use of "unexplained jargon" at the hearing.  Plaintiffs claims that the ALJ sought explanations from other witnesses when she did not understand their testimony, but failed to do the same with Luborsky.  Plaintiffs essentially find fault with a minor point made by the ALJ, when the thrust of the ALJ's opinion on this topic focused on the fact that Luborsky "did not clearly identify what occupational therapy services were needed," and her lack of evidence to support any missing occupational therapy services.  Decision at 28.  After independently reviewing the transcript and Luborsky's testimony, this Court agrees with the ALJ's conclusion that Luborsky did not provide sufficient specificity as to what occupational therapy services the IEP should have included.  As FCPS points out, Luborsky's only testimony regarding the proposed IEP consisted of noting that she "would like [the IEP] to be a little more clear about exactly what services [MCE is] going to get, how much and what kind and when" and that M.C.E. is "going to need some direct services on a weekly basis to help with learning the cursive, learning to use other alternative output methods and for integrating some of the adaptive sensory based strategies."  Tr. at 468-69.  This scant testimony does not persuade this Court that the ALJ misapplied the law by agreeing with Buckley and concluding that the IEP was reasonably calculated to provide M.C.E. with

educational benefits in relation to her occupational therapy needs. Thus, this Court finds sufficient evidence to justify the ALJ's credibility determinations as to the occupational therapists. Accordingly, FCPS did not commit a substantive violation by concluding that the IEP was reasonably calculated to provide educational benefits to M.C.E. with respect to her occupational therapy needs.

### 3. IEP Goals and Objectives

Plaintiffs contend that M.C.E.'s IEP goals and objectives were inadequate because they were too limited and insufficiently challenging. Yet, Plaintiffs do not specify what goals should have been set for M.C.E. Instead, Plaintiffs cite vague testimony from various experts that "the time was right to work seriously on academics with [M.C.E.]," and that though it might take years for M.C.E. to catch up, "she could do it." Summ. J. Mem. at 41. Plaintiffs also complain that the ALJ erred in failing to consider and apply *Carter v. Florence County School District Four*, 950 F.2d 156 (4th Cir. 1991). In *Carter*, the Fourth Circuit held that what is "reasonably calculated" to provide educational benefits for a particular child is a fact-driven inquiry, finding in that case that the goals in the IEP were not acceptable because they would not permit the student to advance from grade to grade. *Id.* at 160. Given that *Carter* emphasizes that an analysis of appropriate IEP goals is "fact-driven," the outcome in that case is instructive only to the extent that the facts are similar to those in this case. Unlike in *Carter*, there has been no evidence here that the goals in M.C.E.'s IEP were unlikely to permit her to advance to the next grade. To the contrary, the evidence shows that the goals the IEP set for M.C.E. were appropriate given her history of emotional issues. Thus, Plaintiffs' reliance on *Carter* is unpersuasive. Accordingly, FCPS did not commit a substantive violation by concluding that the

IEP was reasonably calculated to provide educational benefits to M.C.E. with respect to her goals and objectives.

### 4. Extended School Year Services

Plaintiffs assert that the Extended School Year services listed in M.C.E.'s IEP were insufficient. The IEP provided M.C.E. with two weekly one-hour sessions of classroom instruction in reading during July 2009. The Fourth Circuit has explained that Extended School Year services are necessary "when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *MM ex rel DM v. Sch. Dist.*, 303 F.3d 523 (4th Cir. 2002). In *MM*, the Fourth Circuit found that a disabled student's need for Extended Year Services could be established by expert testimony, but:

> [T]he mere fact of likely regression is not a sufficient basis [to establish a disabled student's need for Extended School Year services] because all students, disabled or not, may regress to some extent during lengthy breaks from school. ESY services are required under the IDEA only when such regression will substantially thwart the goal of meaningful progress.

393 F.3d at 538 (quotation and citation omitted). In other words, a mere finding that some of M.C.E.'s reading skills would erode over the summer months is not grounds to find that FCPS committed a substantive violation of the IDEA.

In this case, Elizabeth Rhodes, FCPS's Coordinator of Special Education for elementary schools, testified that the Extended School Year services written into M.C.E.'s IEP were appropriate based upon how M.C.E. had been progressing with the Horizons reading program. One of Plaintiffs' experts, Dr. Wilcox, testified that: "In the summertime, I think all kids need to have some amount of break and a modified school day, a couple hours in the summer would be sufficient, just to maintain her reading skills." Tr. at 283. Plaintiffs complain that the ALJ

mischaracterized Dr. Wilcox's testimony by interpreting Dr. Wilcox's statement to mean that a few hours of reading assistance *per week* would be sufficient in the summer. Plaintiffs claim that Dr. Wilcox actually said that M.C.E. needed a few hours *per day*. Summ. J. Mem. at 42. Dr. Wilcox's statement does not in fact make clear whether he thinks M.C.E. needs a couple of hours per week or per day. Notably, the ALJ acknowledged this vagueness by finding Dr. Wilcox's testimony to mean that a few hours "presumably per week" would be sufficient over the summer to maintain M.C.E.'s reading skills, though "more of the summer would be preferable." Decision at 30. Given that the findings of fact in an administrative decision are assumed to be *prima facie* correct, *Justin G. v. Board of Education*, 148 F. Supp. 2d 576, 582 (D. Md. 2001), this Court sees no reason to reject the ALJ's interpretation of Dr. Wilcox's testimony.

Plaintiffs also argue that the ALJ erred in rejecting the recommendation of another of Plaintiffs' experts, Dr. Levine, who testified that M.C.E. needed "more" Extended Year Services in reading, math and written expression because she was so far behind. Dr. Levine explained that he was concerned about any "gap in service" which might make it more difficult for M.C.E. to transition back to school. Tr. 1112-13. Dr. Levine's testimony does not compel this Court to disagree with the ALJ's conclusion that the Extended Year Services provided for in M.C.E.'s IEP were adequate as the mere fact of likely regression is not a sufficient basis to establish a disabled student's need for Extended School Year services. Accordingly, FCPS did not commit a substantive violation by concluding that the IEP was reasonably calculated to provide educational benefits to M.C.E. with respect to her Extended Year Services.

### C. The Pyramid Program's Appropriateness

Plaintiffs claim that the ALJ erred in finding that the Pyramid Program was an appropriate educational placement for M.C.E. because of the academic peer group it provided,

24

the social peer group it would afford, and because the program's focus did not encompass her needs. As FCPS points out, the ALJ's decision that the Pyramid Program was appropriate for M.C.E. was based upon on the testimony she heard from over fifteen witnesses during the administrative hearing, her review of 136 exhibits, and the parties' detailed arguments. In making this decision, the ALJ made credibility determinations and weighed contradictory opinions by experts regarding the best placement for M.C.E. Ultimately, the ALJ found that Plaintiffs did not show that the academic levels of the students in M.C.E.'s class would increase her emotional distress, that the gender composition of Pyramid rendered the program unable to meet M.C.E.'s specialized needs, or that its focus failed to include students with similar educational needs.

First, Plaintiffs take issue with the ALJ's finding that they failed to show that the academic level of the "actual students" who would be in M.C.E.'s class at Pyramid would increase her emotional distress. Plaintiffs contend that the ALJ "demanded an impossible level of proof" from them because at the time of the hearing Amy Schwiegerath, Lewistown's principal, had not yet organized the Pyramid classes or selected which students would be in the different classrooms. Summ. J. Mem. at 43. Plaintiffs also assert that the ALJ mischaracterized Schwiegerath's testimony regarding class composition at Pyramid when she concluded that the Program has multi-grade classes and that students are grouped based on their needs. Instead, Plaintiffs claim that Schwiegerath actually testified that students are grouped according to their ages and not their needs, and that whether there is a multi-grade class depends upon the composition of the students in the program.

Plaintiffs' argument takes a few of the ALJ's conclusions out of context and ignores others. For example, the ALJ explicitly acknowledged that the Pyramid class configurations

were "yet to be decided," and that her best guess was that M.C.E. would be placed in a classroom with other fourth graders. Decision at 32. However, when asked how students in the Pyramid Program are assigned to classes, Schwiegerath answered:

> In the summertime we sit down as a school, as a school team, and we look at the needs of the students in the program. We look at their educational needs, we look at their IEP goals, we look at their emotional needs, we look at their behavioral goals. And then we try to group kids with similar needs into similar classrooms. And then we identify characteristics of adults and students—of adults that we feel would best meet the needs of those students.

Tr. at 829. Furthermore, when asked about how the classes are broken down, Schwiegerath responded that most of the classrooms in last year's Program included students of various grade levels. Tr. at 872. The ALJ's finding that "the Program has multi-grade classes and students are grouped based upon their needs" precisely tracks Schwiegerath's testimony. Decision at 32. After an independent review of the record, the ALJ's conclusion that it was likely M.C.E. would be placed with students with similar educational needs is more reasonable than Plaintiffs' preemptive assumption that M.C.E. would be placed with students working at well above her level. Thus, Plaintiffs have not produced evidence that the ALJ's conclusion was incorrect with respect to the academic level of the other students who would potentially be in M.C.E.'s class at Pyramid.

Plaintiffs next take issue with the gender composition of Pyramid. Plaintiffs point out that 29 of the 33 students in the previous year's Program were male, and argue that providing M.C.E. with the opportunity to form female friendships is essential to her development. Plaintiffs assert that the ALJ wrongly concluded that the gender composition of the Pyramid Program was not a problem despite "the consensus that socializing with other girls was an

issue."[2]   Summ. J. Mem. at 44.   Contrary to Plaintiffs' argument, the ALJ explicitly acknowledged that the gender disparity of the Pyramid Program was an issue, but found that this issue could be offset by offering M.C.E. opportunities to bond with female students through recess, "lunch bunches," social skill groups and a girls' book club.  Decision at 32-33.  Plaintiffs' contention that these opportunities would violate the IEP because it requires that all instruction take place in a special education setting is without merit.  FCPS's proposed solution was not that M.C.E. would be included in *instructional* settings with non-disabled female students, but instead that she would be included in *social* settings with non-disabled female students.  After an independent review of the record, this Court finds that the ALJ's conclusion was correct that the gender composition of Pyramid did not render the Program insufficient to meet M.C.E.'s educational needs.

Third, Plaintiffs contend that the ALJ erred in concluding that the behavior of other students in the Pyramid Program would not inhibit the Program's capacity to meet M.C.E.'s specialized needs.  At the hearing, Schwiegerath and Margaret Moore, a Support Teacher who assists students in Pyramid, testified in great detail about the kinds of students who are best suited for the Program.  Though many of the students in the Pyramid have behavioral problems, Schwiegerath testified that at least half of the students did not have any such issues.  Furthermore, Plaintiffs' own witnesses reported that M.C.E. continued to display her own behavioral problems such as refusal behavior and task avoidance.  Tr. 450-51, 481-82.  Thus, this Court finds no convincing evidence that the ALJ was wrong to find that the behavioral problems

---

[2] Notably, the interim Admissions Director at Friendship—the school T.Q.A. believes is best suited for her daughter—testified that the percentage of male students in its special education program is 67%.

of some of the students in Pyramid caused the Program to be unsuited for M.C.E.  Accordingly, the Pyramid Program was appropriate for M.C.E.

## **<u>CONCLUSION</u>**

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED, and this Court accordingly upholds the decision of the Administrative Law Judge.

A separate Order follows.

Dated:  July 11, 2011                                      /s/_____

                                                                    Richard D. Bennett
                                                                    United States District Judge